Filed 10/16/13  P. v. Sapp CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C070137 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F07656) |
| v. | |
| MAURICE SAPP, | |
| Defendant and Appellant. | |

A jury convicted defendant Maurice Sapp of second degree robbery (Pen. Code, § 211), misdemeanor possession of narcotics paraphernalia (Health & Saf. Code, § 11364), and unauthorized use of another person's identifying information (Pen. Code, § 530.5, subd. (a)).  In a bifurcated proceeding, the trial court found that defendant had sustained five prior convictions, including one strike (Pen. Code, §§ 667, subds. (b)-(i), 1170.12) and two serious felonies (Pen. Code, § 667, subd. (a)), and had served three prior prison terms (Pen. Code, § 667.5, subd. (b)).

1

Sentenced to 24 years four months in state prison, defendant appeals and contends the prosecutor committed misconduct and defendant's trial counsel was ineffective in failing to object. We affirm the judgment.

FACTS AND PROCEEDINGS

Defendant was accused of stealing the victim's bank and credit cards, then attempting to use one or more of them at a nearby market. The market's surveillance system recorded defendant on videotape, but the police failed to obtain the videotape and it was not preserved for trial. The only evidence offered from the videotape was a screen shot taken by an officer's cell phone.

Around 11:30 a.m. on November 18, 2010, Janet M., using a walker, walked from her Oak Park apartment to the Sacramento Food Bank. She hung a pouch on the walker that held her identification card, her credit union Visa card, her Social Security card, her Target card, and other personal property.

After getting groceries at the Food Bank, Janet M. started home. As she walked down 33rd Street between Broadway and Second Avenue, a man came up behind her, knocked her down, and took the bag of groceries from her walker. Finding only groceries in the bag, he returned and grabbed her pouch, then ran off. She saw that he was "well built," had short hair and facial hair resembling a goatee, and wore dark jeans and a dark t-shirt.

After Janet M. got home, she asked her apartment manager to call the police. The recorded 911 call was played at trial. According to the transcript provided to the jury, Janet M. said the robber was a black man, "probably" in his 30s, "probably" six feet tall and stocky, wearing a dark shirt and dark pants. She thought he had a goatee, but was not sure.

Sacramento Police Officer Jeff Kuhlmann arrived at Janet M.'s apartment around 1:00 p.m. and spoke to her for 20 or 25 minutes. She described the robber to him.

Officer Kuhlmann testified that she said she would be able to identify the robber if she saw him again; however, she testified that he did not ask her about that.

During the interview, a representative of Janet M.'s credit union called her. Officer Kuhlmann tried to speak to the credit union representative, but was refused because he was not the account holder. He put the call on speaker phone.

According to Janet M., the credit union representative said someone was using her card at the Bonfare Market at Broadway and Alhambra. She had not used it at any Bonfare Market that day. It was one of the cards taken from her in the robbery.

Officer Kuhlmann sent Officers Konrad Von Schoech and Charlie Mantell to the market. They had been given a description of the suspect as "a black male adult in his thirties, wearing dark clothing, approximately six feet tall."

The officers asked to review the store's video footage, hoping to spot a person who matched the suspect's description attempting to use a credit card within a specific time frame "with any suspicious activity associated with it, such as the card was denied, somebody not providing ID and being refused, not being able to pay with that credit card." Using his cell phone, Officer Von Schoech photographed one image from the footage which appeared to him to meet these criteria.

Officer Von Schoech asked for a copy of the entire video, but the store employee who knew how to "burn the images onto a disk" was not there. Since the store had a preexisting arrangement with the police department to have someone from the department go there and "harvest the images," the officers "just left it at that" for the moment.

Officer Von Schoech asked dispatch to notify the person who was supposed to obtain the video. He did not know at the time that this procedure might not be sufficient, and no one subsequently contacted him to tell him that in this case it was not.

Ultimately, the police department employee charged with obtaining such evidence did not obtain a copy of the surveillance video taken at the Bonfare Market on November 18, 2010.

Officer Von Schoech brought the photo to Janet M.'s apartment and showed it to her. According to Officers Von Schoech and Kuhlmann, Janet M. identified the person in the photo as her robber. Janet M. testified, however, that she told them she was not sure if it was him; furthermore, she now thought it was not the robber, although "he looks like him," because he appeared "a little smaller than the guy that ran into me." By smaller, she meant shorter. She acknowledged that during the crime she was looking at the robber from below after he had pushed her down. Janet M. also testified that she had had pretrial conversations with defense counsel and defense investigators, who had all told her defendant was innocent. These conversations were "very nerve wracking."

Officer Von Schoech showed the photo to Officers Clayton Buchanan and Michael Hight, who had been searching for the suspect, when they arrived at Janet M.'s apartment. They left to resume the search.

Driving westbound on Broadway, Officers Buchanan and Hight saw a person who resembled the man in the photo walking eastbound on the south side of the street between 34th and 35th Streets. Officer Buchanan made a U-turn on 34th Street to come up behind the suspect. When the officers were 10 or 15 feet away from him, they saw him drop a white napkin from his right hand onto the sidewalk. Officer Hight detained him.

Officer Buchanan found Janet M.'s California ID card and credit union card inside the napkin. Officer Hight found a glass pipe, apparently used for smoking cocaine, on defendant's person.

The officers notified Officer Kuhlmann of the detention. At approximately 2:46 p.m., he met Officers Buchanan and Hight where the arrest had been made. Soon afterward, he returned to Janet M.'s apartment to bring her to that location for a field

4

showup. According to Janet M., Officer Kuhlmann said "they had . . . caught a guy over on Broadway by the bank that had my property." Officer Kuhlmann did not recall telling her that the suspect had been found with her belongings, but conceded he might have said that.

On the way to the scene, Officer Kuhlmann told Janet M. that a person who matched the description of her assailant had been detained and she would be asked if she could identify him, but if she could not do so or she was unsure, he wanted her to say so. At the scene, from a distance of around 35 feet, she identified defendant as the robber.

That evening, two people came to Janet M.'s apartment with her Target card, Social Security card, and coin purse. They had found the items on 34th Street, about a block from the crime scene.

Defense investigator Jason Sabo contacted Janet M. and her apartment manager on May 26, 2011. According to Sabo, the apartment manager said that the officer who took Janet M. to the field showup told her the police had detained a man on Broadway who had her identification card in his pocket.

## DISCUSSION

Defendant contends that the prosecutor committed misconduct in her examination of Officer Von Schoech and in closing argument by violating the trial court's orders as to the videotape evidence, and that his trial counsel was ineffective in failing to object to those violations.

Prior to trial, defendant brought a motion pursuant to *Arizona v. Youngblood* (1988) 488 U.S. 51 and *California v. Trombetta* (1984) 467 U.S. 479 asking the court to dismiss the charges against defendant or for other sanctions for the prosecution's failure to preserve the videotape from Bonfare Market. The trial court denied the motion. The trial court also ruled that a still photo that one of the officers took with his cell phone of one portion of the tape would be admitted into evidence. Later in the proceedings,

5

defendant moved the court for an order excluding "any discussion by officers as to what . . . was allegedly included" in the videotape. The court granted the motion.

We will first discuss the claim that the prosecutor engaged in prosecutorial misconduct when questioning Officer Von Schoech and then turn to the claim that the prosecutor was guilty of prosecutorial misconduct during the course of the closing arguments to the jury.

A.  *The Testimony of Officer Von Schoech.*

Before the jury, the prosecutor questioned Officer Von Schoech about his actions at the market as follows:

"Q:  When you went to Bonfair [*sic*] Market, what did you do?

"A:  When I went to Bonfair [*sic*] Market, I initially spoke with the clerk and asked to see if there was any suspicious activity by any subjects coming into the market, and also if I could review their surveillance footage.

"Q:  Did you review the surveillance footage?

"A:  Yes, I did.

"Q:  Were you given--before viewing the footage, were you given a specific time frame to look for when the credit card was used?

"A:  Yes, I was.

"Q:  Before going to Bonfair [*sic*] Market--and I'm assuming while you were checking the area, were you given a description of who you were supposed to be looking for?

"A:  Yes, I was.

"Q:  And what was that general description that you were given?

"A:  The general description was a black male adult in his thirties, wearing dark clothing, approximately six feet tall.

"Q:  When you were viewing surveillance video, what were you looking for?

6

"A: I was looking for the time frame and I was looking for anybody matching that general description attempting to use a card."

Defense counsel then said "Objection" and asked to approach the bench. After an unrecorded sidebar discussion, the trial court overruled the objection and ordered that the previous question be read back. Officer Von Schoech continued:

"[A:] *I was looking for the time frame. I was also looking for any person matching the general description of the suspect attempting to use a credit card with any suspicious activity associated with it, such as the card was denied, somebody not providing ID and being refused, not being able to pay with that credit card.*" (Italics added.)

The prosecutor then asked Officer Von Schoech about the photograph he took:

"Q: While you were watching that particular video, did you have occasion to take a photograph of the surveillance video you were watching?

"A: Yes, I did.

"Q: *Why did you take a photograph?*

"A: Initially, you know, even though *the person on the video matched the suspect's description*, we wanted to narrow our scope of searching for suspect [*sic*]. We wanted to make sure that, you know, officers still looking for the suspect had a more narrow scope. So I took the photo with my cell phone with the intent to show it to the victim to see if that was the person who robbed her.

"Q: *And the reason for taking that particular photograph, did he meet the criteria that you were looking for when viewing the video?*

"A: *Yes.*" (Italics added.)

Officer Von Schoech then identified People's Exhibit 3 as the photo he took of one frame of the videotape.

Defendant argues that Officer Von Schoech's testimony emphasized above "violated the court's order not to elicit testimony as to the content of the surveillance video." We do not agree.

The testimony defendant objects to, that is, the testimony that explained why the officer took the photograph that became People's Exhibit 3, does not, except only in the most indirect way, discuss the content of the videotape. The officer was merely explaining why he took that particular picture, that is, because that portion of the videotape depicted a person matching the description given by witnesses to the crime and he was looking for someone attempting to use a credit card in a suspicious manner. While the questions and the answers certainly discuss "the content of the surveillance video," in that the picture came from the surveillance tape, they do so only in the context of explaining the officer's actions relating to an exhibit that the court had already allowed into evidence. At that point, the officer was testifying to the reasons why he took the picture that was Exhibit 3 which the jury had before it. It is apparent to us that the court's ruling on the in limine motion intended to preclude testimony regarding the contents of the tape, other than the picture which is Exhbit 3. The prosecution was not restricted to placing a photograph before the jury with no explanation of its provenance or why it was taken.

Finally, we recognize that the officer's testimony that he was looking for a person using a card "with any suspicious activity associated with it" may have allowed the jury to speculate that the officer had taken the picture because he saw "suspicious activity" elsewhere in the surveillance video. But the trial court specifically instructed the jury that, in deciding the facts, the jury "must use only the evidence that was presented in th[e] courtroom." We presume the jury followed the instructions (*People v. Holt* (1997) 15 Cal.4th 619, 662; *People v. Cruz* (2001) 93 Cal.App.4th 69, 73) and did not engage in unwarranted speculation. We note, too, that the jury was able to determine on its own whether Exhibit 3 itself showed suspicious activity.

8

Under the circumstances we are unable to discern how, taking the court's ruling altogether, including the court's admission of Exhibit 3, the questions and answers violated the order. We find no prosecutorial misconduct in the questioning of Officer Von Schoech.

B.      *Closing Arguments*

After the examination of Officer Von Schoech concluded, counsel argued outside the jury's presence that it was improperly suggestive under Evidence Code section 352 to allow the officer to testify that the person he saw in the videotape matched the criteria for the alleged suspect. During the course of this discussion, the court said: "So [the prosecutor], you cannot argue in closing argument [']this is the criteria and he matched all of this, didn't have identification,['] cannot do that because that has not been the testimony. That is not the testimony. [¶] So at this point I would say there was no objection when this came in, but I don't believe that the line has been crossed. And I'm placing those restrictions on closing argument."

Defendant argues that the prosecutor violated the court's order and was guilty of prosecutorial misconduct when she argued as follows:

"When the officers sent to [Bonfare] Market 34, Officer [Von Schoech] went in for the very specific purpose with very specific information. He was given the time frame as to when the victim's card was used. He was given the description. And he was looking for certain activity. He said he watched the video for fifteen to twenty minutes sometimes shifting camera angles. And this [Exhibit 3] is the picture that he took. *This is the picture that met all the criteria that he was looking for in the time frame matching the description engaging in activity that matched the description of what they had heard happened."* (Italics added.)

And:

"So again, all those pieces, when you fit them together, the fact that he matched the description, the fact that [the victim] identified him that day, the fact that she's still kind of identifying him in court, but doesn't want to be that certain. *The fact that he's seen in the store using her card* at the store where her card was used per records, and that's two hours later, walking down the street, sees the cops, and drops the cards." (Italics added.)

And finally:

"*The fact that he's seen using her card*, that he's seen dropping the cards just hours later, tells you that he is guilty of all these charges." (Italics added.)

Defendant argues that "the prosecutor repeatedly discussed the content of the surveillance video in her closing arguments." But once again, defendant's argument depends on the untenable position that, by using the photograph that had been admitted into evidence, the prosecutor violated the court's rulings because that photograph came from the surveillance photo.

We note that Exhibit 3 shows a black male in what appears to be a market carrying what is, arguably, a credit card. Except for the technically inaccurate statement that defendant is seen in the photograph "using her card" where in fact the photo only shows at most defendant "using a card" (a point the prosecutor apparently caught during the first reference when she immediately argued instead that defendant was seen in a store and that the victim's card had been used in the store), the prosecutor's arguments sprang from what could be seen in the photo which the jury had before it. Again, under all of the circumstances, we do not find that the prosecutor violated the court's order as argued by the defendant and, thus, there was no prosecutorial misconduct.

Given our resolution of the issue before the court in this appeal, we need not discuss the People's argument that the issue of prosecutorial misconduct was forfeited by defendant's failure to object at trial. Nor do we need to address defendant's claim of

ineffective assistance of trial counsel in counsel's failure to object to the matters discussed herein.  Counsel is not required to make unsupportable objections.

DISPOSITION

The judgment is affirmed.


      HULL      , Acting P.  J.


We concur:


     MAURO     , J.


     MURRAY    , J.